DAVID H. KRAMER, State Bar No. 168452
CHARLES T. GRAVES, State Bar No. 197923
RIANA S. PFEFFERKORN, State Bar No. 266817
WILSON SONSINI GOODRICH & ROSATI
Professional Corporation
650 Page Mill Road
Palo Alto, CA 94304-1050
Telephone: (650) 493-9300
Facsimile: (650) 565-5100
Email: dkramer@wsgr.com

Attorneys for Plaintiff
Twitter, Inc.

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| TWITTER, INC., a Delaware corporation,<br><br>    Plaintiff,<br><br>  v.<br><br>SKOOTLE CORP., a Tennessee corporation; JAMES KESTER, an individual; and TROY FALES, an individual,<br><br>    Defendants. | CASE NO.: 3:12-cv-1721 SI<br><br>FIRST AMENDED COMPLAINT FOR (1) BREACH OF CONTRACT; (2) TORTIOUS INTERFERENCE WITH CONTRACT; (3) FRAUD; AND (4) UNFAIR OR DECEPTIVE BUSINESS PRACTICES<br><br>JURY TRIAL DEMANDED |

Plaintiff Twitter, Inc. ("Twitter") brings this civil action against Skootle Corporation, James Kester, and Troy Fales (collectively, "Defendants"), and for its first amended complaint alleges as follows on personal knowledge as to its own actions and on information and belief as to the actions of others:

## I.    INTRODUCTION

1. Twitter operates one of the world's most popular online communications platforms, with over 140 million active users. Twitter's widespread success comes in large part because Twitter is dedicated to providing a high quality user experience that promotes meaningful interactions between its users. Among other things, Twitter protects its users' experience by prohibiting a variety of fraudulent and deceptive practices on the Twitter platform, which Twitter

refers to collectively as "spam." Twitter has deployed a host of human and technological measures to detect and combat spam on the Twitter platform.

2. By this action, Twitter seeks to hold Defendants and those who continue to ply the spam trade accountable for the costs of their misconduct, and further safeguard its platform and users from blatantly abusive activities.

3. As described below, Defendants distribute a software tool called "TweetAdder" that is designed to facilitate abuse of the Twitter platform and marketed to dupe consumers into violating Twitter's user agreement.

## II. THE PARTIES

4. Plaintiff Twitter is a corporation incorporated in Delaware with its principal place of business in San Francisco, California.

5. Defendant Skootle Corporation ("Skootle") is a corporation incorporated in Tennessee, with its principal place of business in the State of Virginia, doing business in the State of California.

6. Defendant James Kester ("Kester") is an individual who conducts business in the State of California and is domiciled in the State of Virginia. Kester is the principal officer of Defendant Skootle.

7. Defendant Troy Fales ("Fales") is an individual who conducts business in the State of California and is domiciled in the State of North Carolina. Plaintiff has recently learned that Fales has been, and on information and belief continues to be, an employee of Defendant Skootle, during at least part of the relevant time period.

8. Defendants Skootle, Kester, and Fales shall be referred to collectively in this Complaint as "TweetAdder," except as otherwise specified.

## III. JURISDICTION AND VENUE

9. This Court has diversity jurisdiction over this action under 28 U.S.C. § 1332 because Plaintiff is a citizen of a different state from each Defendant and because the value of the matter in controversy exceeds $75,000 with respect to Plaintiff's claims against the Defendants.

10. Venue is proper in this District under 28 U.S.C. § 1391(a)(2) because a substantial part of the events giving rise to the claims at issue in this lawsuit occurred in this District. Defendants have repeatedly, knowingly, and improperly targeted wrongful acts at Twitter, which is headquartered in this judicial district, and have caused harm in this judicial district.

### IV. INTRADISTRICT ASSIGNMENT

11. Assignment to the San Francisco Division of this Court is appropriate under Civil L.R. 3-2, in that the claims asserted herein arose in San Francisco County, and because Twitter is headquartered in San Francisco County.

### V. GENERAL ALLEGATIONS

**A. Twitter's Service**

12. Plaintiff Twitter, Inc.'s eponymous service, Twitter, is an online communications platform that lets users share and receive information in real-time through short messages called "Tweets," which have a maximum length of 140 characters. Twitter connects its users with the latest information about their interests. The service is free of charge and open to anyone.

13. Users must agree to Twitter's Terms of Service – as discussed below – in order to create an account. Each user's account is denominated by a name selected by the user, together with the @ symbol. From that unique account address, the user can then broadcast messages to the service generally. These messages will be delivered to other Twitter users that have chosen to subscribe to their Tweets, or "follow" them. As an example, @whitehouse can transmit messages that are viewable to anyone who navigates to the public profile page of @whitehouse, or anyone who searches for Tweets by @whitehouse. Users who have "followed" @whitehouse will receive Tweets from that account as they are transmitted. Users can also "un-follow" a user to stop receiving the other user's Tweets.

14. Separately, Twitter users can also direct their Tweets to other specific users by including other account names, together with the @ symbol, within the text of their Tweet. These types of Tweets are called "@replies" or "@mentions." These Tweets will be delivered directly to the account-holders that are "@mentioned" within a Tweet, regardless of whether they have

FIRST AMENDED COMPLAINT BY TWITTER, INC.  -3-
CASE NO. 3:12-CV-1721 SI

specifically subscribed to the accounts. Twitter users may also send private Tweets, called "direct messages," to other users, which are viewable only by the recipient (and the sender).

15. A Twitter user can mark keywords or topics in a Tweet by including the # symbol, which is colloquially called a "hashtag" on Twitter, before a relevant keyword in the Tweet, with no spaces between the two elements. The combination of the # symbol and the keyword is also referred to colloquially as a "hashtag." For example, including the hashtag "#california" indicates that a Tweet is about California. Twitter's algorithms analyze the content of Tweets to determine current popular topics of discussion on Twitter, which are referred to on Twitter as "trending topics."

**B.  "Spam" on Twitter**

16. Twitter has taken special efforts to make its service beneficial for businesses. As a result, companies of every size now use Twitter to connect with customers, including driving new business, offering discounts and deals, and providing customer service.

17. While many legitimate companies have grown their businesses through Twitter, the service has also become an unwilling host to unscrupulous entities which exhibit a variety of abusive behaviors on Twitter. Such behaviors are referred to as "spam," a term borrowed from the popular word for unsolicited commercial email messages. Examples of "spam" include posting a Tweet with a harmful link (including links to phishing or malware sites) and abusing the @reply and @mention function to post unwanted messages to a user. Sending such messages is known as "spamming," and the senders of such messages are called "spammers."

18. Spam Tweets typically contain advertisements for businesses, products, or services that are often, if not typically, false and misleading. Regardless, recipients do not desire these unsolicited messages and they interfere with recipients' use and enjoyment of the Twitter service.

19. Spam Tweets are typically sent from Twitter accounts created for the sole purpose of spamming Twitter users. These spam accounts frequently use software programs that automate Twitter functions such as following and un-following users and sending Tweets and @replies to users. Automated spam accounts are colloquially referred to on Twitter as "bots" or "spambots." These spam software programs typically permit spambots to rapidly follow or un-follow a large

number of users, to send a high volume of spam Tweets, and to automatically send Tweets or @replies to users who mention certain keywords, hashtags, or trending topics in their Tweets.

20. Twitter has invested a great deal of money and effort to prevent and fight spam. Twitter empowers users to fight spam by letting them block accounts and report them for spamming. Twitter also limits the number of Tweets and direct messages an account can send per day and the number of users an account can follow.

21. Twitter employs a dedicated Trust & Safety team whose sole job is fighting spam on Twitter. Twitter has dramatically expanded this team during the past year in response to spam-based misconduct, including Defendants' misconduct. Twitter's Trust & Safety team investigates users' spam reports and terminates spam accounts. Nevertheless, many spammers – including those using Defendants' software – generate replacement accounts when one of their spam accounts is terminated and thus can quickly resume their spamming activities.

22. Certain spam software – such as the software offered by Defendants – allows a spammer to create a large number of accounts, making it easier for spammers to shift to new accounts and to use dozens or even hundreds of spam accounts at once.

23. Spammers and the makers of spam software, including the Defendants in this action, harm Twitter by negatively affecting Twitter users' experience, damaging users' goodwill toward Twitter, and causing Twitter users to terminate their Twitter accounts due to dissatisfaction with the level of spam on Twitter. Spammers and the makers of spam software, including the Defendants in this action, have also forced Twitter to spend money – including substantial amounts during the year leading up to the institution of this action, and in the months since – on costly anti-spam efforts as a proximate and direct result of their misconduct. Twitter would not have incurred these costs if such misconduct did not take place. Such costs include those for implementing technical measures to fight spam on Twitter, and those for expanding a specialized team to detect, monitor, fight, and respond to user complaints and inquiries regarding spam. Specifically, Twitter has incurred costs of at least $75,000 to engage in anti-spam efforts to combat the wrongdoing of TweetAdder. Twitter would not have incurred such costs but-for the misconduct of Defendants.

### C. Twitter's User Agreement

24. In order to create a Twitter account and use Twitter's service, or otherwise access the service, a would-be Twitter user must first agree to be bound by Twitter's user agreement, which comprises the Twitter Terms of Service ("Terms"), the Twitter Rules, and Twitter's Privacy Policy (collectively the "TOS"). The Terms of Service and Rules are attached as Exhibit A and can also be found on Twitter's website.

25. Twitter users who agree to Twitter's TOS enjoy a limited, non-assignable license to access and use Twitter's websites and services, subject to acceptance of and compliance with the TOS. By accessing or using Twitter's websites and services, a user agrees to be bound by the TOS.

26. Twitter's TOS expressly prohibit spamming. The Twitter Rules (incorporated into the TOS) include rules against certain activities defined as "Spam and Abuse." The Rules provide that "user abuse … will result in permanent suspension. Any accounts engaging in the activities specified [as Spam and Abuse] are subject to permanent suspension." The Rules further provide that engaging in any prohibited activities may result in investigation for abuse, and that Twitter reserves the right to immediately terminate an account without further notice if Twitter determines that an account violates the Rules or the Terms.

27. Activities forbidden as "Spam and Abuse" under the Rules include the creation of serial accounts for disruptive or abusive purposes, or with overlapping uses. The "Spam and Abuse" Rules further forbid the use of the Twitter service for the purpose of spamming users. The Rules provide that Twitter determines what constitutes "spamming," based on criteria including, but not limited to, the following account behaviors: (a) following a large number of users in a short amount of time; (b) following and un-following people in a short time period, particularly by automated means (a practice known as "churn"); (c) Tweeting misleading links; (d) sending multiple Tweets to hashtags or trending or popular topics that are unrelated to those hashtags or topics; (e) posting the same Tweet across multiple accounts or duplicate Tweets to the same account; (f) sending large numbers of duplicate @reply Tweets or Tweets mentioning particular users; (g) the number of spam complaints filed against the account; (h) creating or purchasing

accounts in order to gain followers; and (i) using or promoting third-party sites that claim to generate more followers for an account, including "sites promising 'more followers fast,' or any other site that offers to automatically add followers to your account." In addition, the Rules prohibit creating accounts for the purpose of selling such accounts, and they prohibit selling usernames. The Rules provide that an account may be suspended for TOS violations if Twitter detects any of the above activities.

28. For a third-party software application to communicate with the Twitter service, the TOS requires the use of Twitter's Software Programming Interface ("API"). Through the TOS, Twitter forbids accessing, searching, or attempting to access or search Twitter's services by any means, automated or otherwise, other than Twitter's official published interfaces, except by separate, express agreement with Twitter.

29. Each of the Defendants has agreed to the TOS by opening at least one user account on Twitter, and each has knowledge of the terms of the TOS. The Defendants opened at least one user account in order to develop the TweetAdder software to operate on Twitter's website.

**D. TweetAdder's Abuse of the Twitter Service**

30. Defendant TweetAdder operates a website available at http://www.tweetadder.com. It is the creator of a desktop computer program called "TweetAdder" that enables users to automate the process of creating accounts and broadcasting spam Tweets to an enormous number of users. It licenses the TweetAdder software in packages of one, five, ten, or an unlimited number of Twitter accounts.

31. In the months leading up to the filing of the instant action and in the months since, Twitter has received scores of complaints about myriad spam accounts that use the TweetAdder software. Some Twitter users employing the software to create accounts and send spam have been misled by TweetAdder into believing that use of the software for such purposes was permissible.

32. TweetAdder promotes its software on its website as offering the following features, the use of which by a Twitter user would constitute a breach by the user of the TOS: (a) multiple account management; (b) automated following and un-following of other users; and (c) automated generation of Tweets, re-Tweets and @replies.

33.     Plaintiff has recently learned that Defendant Fales is the primary designer of the TweetAdder software. Defendant Fales deliberately designed the TweetAdder software to violate the TOS.

34.     Nothing on the TweetAdder website informs prospective licensees that the intended use of the software to send spam violates Twitter's Terms of Service. Rather, the website is designed to create the impression that the software is created for permissible and appropriate use with Twitter's service. The TweetAdder website claims that licensees can "get more followers, instantly." It also advertises that licensees can "[u]se our program on an unlimited number of Twitter profiles with TweetAdder Platinum!" TweetAdder also advertises that its software "[w]orks your [T]witter profile or profiles like a human being." These statements and others like them deceive users into believing that using the TweetAdder software will conform to Twitter's TOS and/or avoid having their accounts suspended for TOS violations.

35.     These features and representations, among others, induce Twitter users who license TweetAdder to violate the TOS, and deceive consumers through deceptive advertising.

36.     TweetAdder advertises that the TweetAdder software does not use Twitter's API to access Twitter's websites and services. It developed and uses automated scripts through which the TweetAdder software accesses Twitter's websites and services without Twitter's authorization.

37.     By connecting the TweetAdder software to Twitter's websites and services through unauthorized means rather than through Twitter's API, TweetAdder violates the Twitter TOS and induces violations thereof by the users of its software.

38.     TweetAdder has benefited financially from its behavior while at the same time harming Twitter and its users. TweetAdder purposefully directed its intentional activities toward California, thereby causing harm TweetAdder knew was likely to be suffered by Twitter in California.

## FIRST CLAIM FOR RELIEF
### Breach of Contract

39.     Plaintiff Twitter realleges and incorporates by reference the allegations in all the preceding paragraphs as though fully set forth herein.

40. All Twitter users, including the Defendants, are parties to the TOS and are bound to the TOS through their actions. The TOS is a valid, enforceable contract through which Twitter provided Defendants with a limited license to use the Twitter websites and services. By entering into this contract, Defendants, and each of them, purposefully availed themselves of the privilege of conducting business in California.

41. Twitter has performed all of its obligations under the TOS that were not excused by the Defendants' actions.

42. As set forth in the paragraphs above, the Defendants exceeded the scope of, materially breached, and continue to materially breach the terms of the TOS by engaging in specific acts which constitute spam and related abuses, including: (1) connecting to Twitter's websites and services through unauthorized means rather than through Twitter's API; (2) inducing the creation of serial Twitter accounts for disruptive or abusive purposes, or with overlapping uses; (3) using software to interfere with and disrupt the access of other users; (4) using software which scripts the creation of content in such a manner as to interfere with or create an undue burden on Twitter's services; and (5) using software to induce spamming conduct including, but not limited to, (a) following a large number of users in a short amount of time; (b) following and un-following people in a short time period by automated means; (c) Tweeting misleading links; (d) sending multiple Tweets to hashtags or trending or popular topics that are unrelated to those hashtags or topics; (e) posting duplicate Tweets to the same account; (f) sending large numbers of duplicate @reply Tweets or Tweets mentioning particular users; (g) having a number of spam complaints filed against the accounts; and (h) using or promoting third party sites that claim to generate more followers for an account.

43. As a direct and proximate result of Defendants' ongoing material breaches of the TOS, Twitter has been harmed and is entitled to monetary damages against each of them in an amount to be determined at trial, but exceeding the minimum unlimited jurisdiction of this Court, exclusive of attorneys' fees and costs.

///

///

FIRST AMENDED COMPLAINT BY TWITTER, INC.   -9-
CASE NO. 3:12-CV-1721 SI

## SECOND CLAIM FOR RELIEF
### Tortious Interference with Contract

44. Plaintiff Twitter realleges and incorporates by reference the allegations in all the preceding paragraphs as though fully set forth herein.

45. All users of the Defendants' software (the "TweetAdder Users") are parties to Twitter's TOS, which is a valid and enforceable contract.

46. Twitter has performed all of its obligations under the TOS that were not excused by the actions of the TweetAdder Users. The TweetAdder software includes features that, when used on Twitter's service, breach Twitter's TOS, as more fully set forth in the preceding paragraphs.

47. By designing, creating, and marketing the TweetAdder software for use on Twitter as more fully described in the preceding paragraphs, each Defendant was and is aware of the TOS contract between Twitter and the TweetAdder Users. Notwithstanding that knowledge, the Defendants induced and continue to induce Twitter users to breach their contracts with Twitter.

48. Defendants have intentionally and maliciously interfered with Twitter's contracts with the TweetAdder Users by committing the following wrongful acts, among others: (a) knowingly including features in their respective software offerings that enable users to breach Twitter's TOS, and promoting, marketing, and/or advertising those features in order to induce such users to breach Twitter's TOS; and (b) knowingly inducing, encouraging, and allowing the TweetAdder Users to send unsolicited commercial messages to Twitter users through the TweetAdder software, all without Twitter's authorization.

49. As a direct and proximate result of the Defendants' intentional and malicious interference with Twitter's contracts, Twitter has been and continues to be harmed and is entitled to both injunctive relief and monetary damages against each of them in an amount to be determined at trial, but exceeding the minimum unlimited jurisdiction of this Court, exclusive of attorneys' fees and costs.

50. The Defendants' ongoing acts of tortious interference constitute transgressions of a continuing nature for which Twitter has no adequate remedy at law. Unless the Defendants are

each enjoined from further acts of tortious interference, Twitter will suffer irreparable injury to its business goodwill.

51. The Defendants' actions of inducement and interference – as shown through their deceptive marketing tactics and their deliberate creation of software designed to facilitate breach of the TOS and annoy Twitter users with unsolicited spam – were intentionally undertaken to injure Twitter and/or undertaken with willful and conscious disregard of Twitter's rights, and constitute clear and convincing evidence of oppression, fraud, and malice. For these reasons, Twitter is entitled to an award of punitive damages against each Defendant in an amount sufficient to deter each of them from future misconduct.

## THIRD CLAIM FOR RELIEF
### Fraud

52. Plaintiff Twitter re-alleges and incorporates by reference the allegations in all the preceding paragraphs as though fully set forth herein.

53. Through the acts of creating one or more Twitter accounts and/or by creating software that accesses Twitter's service, Defendants have agreed to be bound by the TOS. In agreeing to be bound by the TOS, Defendants misrepresented to Twitter that they would comply with the TOS. Defendants made those false promises having no intention of performing them.

54. Twitter justifiably relied on Defendants' representations and granted access to the Twitter service. When Defendants made these representations, each of them knew them to be false and made these representations with the intention to defraud Twitter and to induce Twitter to act in reliance on these representations in the manner alleged.

55. As a direct and proximate result of Defendants' fraudulent conduct, Twitter has suffered losses including, but not limited to, (1) loss of business relationships; (2) loss of prospective business relationships; (3) loss of goodwill; and (4) expenditures of money, server space, personnel, and other resources that Twitter would not have been forced to expend but for Defendants' fraudulent conduct. Twitter therefore is entitled to monetary damages against each of the Defendants in an amount to be determined at trial, including a constructive trust over each of

the Defendants' ill-gotten gains, but exceeding the minimum unlimited jurisdiction of this Court, exclusive of attorneys' fees and costs.

56. Defendants' intentional conduct of making misrepresentations and concealing material facts known to them, with the intention of depriving Twitter of property or legal rights or otherwise causing injury, was fraudulent and despicable conduct that subjected Twitter to an unjust hardship in conscious disregard of Twitter's rights, so as to justify an award of exemplary and punitive damages.

## FOURTH CLAIM FOR RELIEF

### Unlawful, Unfair, and Fraudulent Business Practices Under California Business & Professions Code § 17200, *et seq.*

57. Plaintiff Twitter realleges and incorporates by reference the allegations in all the preceding paragraphs as though fully set forth herein.

58. The acts and conduct of each Defendant as alleged above in this Complaint constitute unlawful and/or fraudulent business acts or practices as defined by California Business and Professions Code section 17200 *et seq.* ("Section 17200").

59. Each of the Defendants' conduct is fraudulent under Section 17200 because reasonable consumers have been and will continue to be confused and deceived by Defendants' business and advertising practices. Specifically, Defendants deceive the public by causing Twitter users to believe that their use of the TweetAdder software will not violate Twitter's Terms of Service and will not cause Twitter to suspend their accounts for violations of those Terms of Service. The Twitter Trust & Safety Team has responded to dozens of appeals from suspended users that signed up for the TweetAdder software.

60. Each of the Defendants' conduct is unlawful under Section 17200 because, as described in detail in the paragraphs above, Defendants have engaged in the independently unlawful wrongs of breach of contract, tortious interference with contract, and fraud, to Twitter's detriment.

61. Defendants' unlawful and fraudulent business acts or practices have caused and continue to cause irreparable harm to Twitter. Unless such practices are enjoined, Defendants will

each cause further irreparable and incalculable injury, whereby Twitter has no adequate remedy at law, as a direct and proximate result of their unfair and deceptive business practices in violation of Section 17200. Thus, pursuant to California Business and Professions Code section 17203, Twitter is entitled to an order of this Court enjoining Defendants, and each of them, from continuing to engage in unlawful and/or fraudulent business acts or practices as defined in Section 17200.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff Twitter prays for the following relief:

A.  For injunctive relief, as follows:

1.  As against each of Defendants Skootle, Kester, and Fales, a preliminary injunction and a permanent injunction enjoining and restraining such Defendants, and all persons or entities acting in concert with them, during the pendency of this action and thereafter perpetually from:

(a) Creating or soliciting the creation of Twitter accounts for purposes that violate Twitter's Terms of Service (including the Twitter Rules);

(b) Accessing, searching, or attempting to access or search Twitter's website, computer systems, and services in order to engage in specific acts that violate Twitter's Terms of Service (including the Twitter Rules);

(c) Creating, developing, manufacturing, adapting, modifying, making available, trafficking in, using, disclosing, selling, licensing, distributing (with or without monetary charge), updating, providing customer support for, or offering for use, sale, license, or distribution (with or without monetary charge), any software or technology designed for use in connection with Twitter's service, the use of which would violate Twitter's Terms of Service (including the Twitter Rules) (including but not limited to TweetAdder, TweetAdder Platinum, TweetAdder 2009, TweetAdder 2010, and TweetAdder 3.0);

(d) Transmitting, assisting with the transmission of, or procuring or inducing the transmission of unsolicited commercial messages to users on Twitter's service, including but not limited to Tweets, @replies, and direct messages, to Twitter users;

(e) Engaging in false representations or false advertising that would misleadingly suggest to a reasonable consumer that a software or other technology conforms to Twitter's Terms of Service (including the Twitter Rules) and/or will not result in a Twitter user's account being suspended; and

(f) Engaging in any activity that violates, or induces others to violate, Twitter's Terms of Use, Rules, or Privacy Policy.

B. An award to Twitter of damages, assessed jointly and severally, including but not limited to, compensatory, statutory, punitive, and exemplary damages, restitution, and disgorgement of profits, as permitted by law and in such amounts to be proved at trial. Such damages shall be no less than $75,000.

C. An award to Twitter of reasonable costs, including reasonable attorneys' fees, to the extent permitted by law.

D. For pre- and post-judgment interest as allowed by law.

E. For such other relief as the Court may deem just and proper.

Dated: November 19, 2012                    Respectfully submitted,


                                             */s Charles T. Graves*
David H. Kramer
Charles T. Graves
Riana S. Pfefferkorn
WILSON SONSINI GOODRICH & ROSATI
Professional Corporation
650 Page Mill Road
Palo Alto, CA 94304-1050
Telephone:    (650) 493-9300
Facsimile:    (650) 565-5100
Email:        dkramer@wsgr.com
              tgraves@wsgr.com
              rpfefferkorn@wsgr.com

***Attorneys for Plaintiff Twitter, Inc.***

## JURY DEMAND

Plaintiff hereby demands a trial by jury as to all issues so triable in this action.

Dated: November 19, 2012　　　　　　　　Respectfully submitted,


　　　　　　　　　　　　　　　　　　　　　/s *Charles T. Graves*
　　　　　　　　　　　　　　　　　　　　David H. Kramer
　　　　　　　　　　　　　　　　　　　　Charles T. Graves
　　　　　　　　　　　　　　　　　　　　Riana S. Pfefferkorn
　　　　　　　　　　　　　　　　　　　　WILSON SONSINI GOODRICH & ROSATI
　　　　　　　　　　　　　　　　　　　　Professional Corporation
　　　　　　　　　　　　　　　　　　　　650 Page Mill Road
　　　　　　　　　　　　　　　　　　　　Palo Alto, CA 94304-1050
　　　　　　　　　　　　　　　　　　　　Telephone:　(650) 493-9300
　　　　　　　　　　　　　　　　　　　　Facsimile:　(650) 565-5100
　　　　　　　　　　　　　　　　　　　　Email:　　　dkramer@wsgr.com
　　　　　　　　　　　　　　　　　　　　　　　　　　tgraves@wsgr.com
　　　　　　　　　　　　　　　　　　　　　　　　　　rpfefferkorn@wsgr.com

　　　　　　　　　　　　　　　　　　　　***Attorneys for Plaintiff Twitter, Inc.***